**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| KLAMATH STRATEGIC INVESTMENT FUND, LLC | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 5:04-cv-278 (lead case, consolidated with Civil Action No. 5:04-cv-279) |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

This case is before the Court on remand from the United States Court of Appeals for the Fifth Circuit to resolve the narrow issue of whether certain expenses associated with foreign currency transactions entered into by Charles "Cary" Patterson ("Patterson") and Harold Nix ("Nix") through Klamath Strategic Investment Fund, LLC ("Klamath") and Kinabalu Strategic Investment Fund, LLC ("Kinabalu," and with Klamath, collectively the "Partnerships") are tax deductible. After carefully considering the parties' written submissions and the direction of the Court of Appeals in its remand Order, the Court finds that the operating expenses at issue are tax deductible because Nix and Patterson controlled the Partnerships at the time the operating expenses were incurred.

## II. Procedural Background

Klamath and Kinabalu were formed in 2000 for Patterson and Nix to make investments in foreign currency transactions.[1] After the IRS issued notices of Final Administrative Adjustment ("FPAAs") to adjust how the partnerships reported these investments for tax purposes, Nix and

[1] The other partners in the partnerships were Presidio Resources LLC and Presidio Growth LLC (collectively "Presidio"). (Dkt. No. 263, at 2.)

Patterson filed these suits (now consolidated) as partners in the Partnerships to challenge the FPAAs.

In *Klamath Strategic Inv. Fund v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) ("*Klamath I"*), this Court granted partial summary judgment in favor of Nix and Patterson on the central legal issue raised in the FPAAs, which is the proper tax treatment under Section 752 of the Internal Revenue Code of amounts borrowed from National Westminster Bank, plc, ("NatWest") to facilitate and provide leverage for the Partnerships' investments. The Court held that the Partnerships' treatment of these amounts was proper under Section 752. The Court also held that the IRS could not retroactively change how Section 752 applies in this case by issuing a purportedly retroactive regulation three years after Nix and Patterson originally made their investments.

Following a week-long bench trial, the Court held in *Klamath Strategic Inv. Fund v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007) ("*Klamath II*"), that Nix and Patterson made these investments for the primary purpose of earning a profit. However, the Court nonetheless concluded that the transactions lacked "economic substance." The Court reached this conclusion because if found that, unbeknownst to Nix and Patterson, NatWest and Presidio had a secret understanding that the Partnerships would not actually use the loan proceeds in the investment transactions. The Court held that under these circumstances Nix and Patterson acted reasonably, in good faith and in reliance on proper advice of counsel. As a result, they were not liable for the extensive penalties that the IRS sought to impose due to what the IRS considered substantial underpayment of taxes due as a result of this transactions.

Subsequent to the Court's decision in *Klamath II,* the Government moved for reconsideration of the decisions from *Klamath I* and *Klamath II*. The Court denied the

Government's motion and reaffirmed its earlier decisions. *Klamath Strategic Inv. Fund v. United States*, 2007 WL 1051766 (E.D. Tex. April 3, 2007) ("*Klamath III*"), *vacated* 568 F.3d 537 (5th Cir. 2009). This Court also determined in *Klamath III* that, because Nix and Patterson were principally motivated to make a profit, they were entitled to deduct the fees and costs that they incurred in making these investments.

On appeal, the Fifth Circuit affirmed that: (1) the loans lacked economic substance and would therefore be disregarded; and (2) Nix and Patterson were not subject to the penalties asserted by the Government. The Fifth Circuit reversed this Court's decision regarding the operating expenses. As a part therefore, the Fifth Circuit held that the interest on the loans was not deductible. However, rather than render its own judgment as to the deductibility of other expenses (specified below), the Fifth Circuit Court remanded that issue to this Court for further consideration and analysis. *Klamath*, 568 F.3d 537. The specific expenses to be considered on remand are:

| | |
|---|---|
| NatWest Loan breakage fee: | $194,350 |
| Management fee to Presidio: | $687,500 |
| Guaranteed payment to Presidio: | $18,000 |
| State LLC fee: | $3,126 |
| State tax: | $800 |
| **Total**: | **$903,776** |

In determining whether the foregoing expenses are deductible, the Fifth Circuit made it clear that the "crucial inquiry" is to determine which partner (Nix and Patterson or Presidio) effectively controlled the partnership's activities at the time the expenses were incurred. *Id.* at 551.[2]

[2] The Government now argues that the Court should disregard the loan breakage fees and part of the management fees

## III. Relevant Facts

The Fifth Circuit's opinion contains a full recitation of the facts in this case. Accordingly, this Court sets out below only those facts relevant to the remanded issue presently before the Court.

### *A. Pre-Investment Due Diligence*

During 1999, Patterson and Nix discussed the possibility of investing in foreign currencies to diversify their investments and earn profits. *See Klamath II*, 472 F. Supp. 2d at 888-89. To this end, Nix and Patterson enlisted the aid of the firm of Pollans & Cohen to identify and vet potential foreign currency investments. *Id*. Specifically, Nix and Patterson asked Sid Cohen, a partner in Pollans & Cohen, to identify a firm that specialized in foreign currency trading and with whom they could work to make such investments. *Id*. Sid Cohen identified Presidio, which held itself out as a firm that specialized in making highly leveraged foreign currency investments. *Id*.

Most of Nix and Patterson's interactions with Presidio were through Sid Cohen, but Sid Cohen did facilitate several meetings between Nix and Patterson and Presidio representatives (John Larson and Amir Makov). *Id*. At a meeting in Houston, Texas, Larson explained the Presidio investment strategy to Nix and Patterson, including the potential to make a profit through the devaluation of pegged currencies. *Id*. at 890. Rather than immediately invest with Presidio, following this meeting, Nix and Patterson asked Sid Cohen to continue his due diligence of Presidio. *Id*. At a second meeting in Daingerfield, Texas, Makov explained to Nix and Patterson why he thought they could make a profit by investing in the Argentine Peso and Hong Kong Dollar

---

because they were paid in connection with transactions this Court ultimately found to lack economic substance. (Dkt. No. 264, at 16-18.) The Court disagrees. The Fifth Circuit remanded this case for further consideration of the limited issue of which partner "controlled" the partnership at the time the operating expenses were incurred. *Klamath*, 568 F.3d 537 (5th Cir. 2009). Faithful to this directive, the Court limits its analysis to only this single issue.

using Presidio's strategy. *Id*. at 891. After this second meeting, additional time passed while Nix and Patterson continued to discuss this investment strategy further, before ultimately deciding to invest in foreign currencies through Presidio. *Id*.

For his role in finding and vetting Presidio and facilitating meetings between Nix and Patterson and Presidio representatives, Sid Cohen received a $250,000 fee from each of Nix and Patterson. *Id*. at 894. Nix and Patterson reported the fee paid to Sid Cohen on their individual tax returns. The fee was not passed through to the Partnerships.

*B. The Investments at Issue*

On April 6, 2000, after a meeting with Presidio representatives and consulting with Sid Cohen, Nix and Patterson (acting through their single member LLCs, St. Croix and Rogue) each invested respectively in the Klamath and Kinabalu Partnerships. Klamath and Kinabalu were formed as Delaware limited liability companies that were treated as partnerships for U.S. federal income tax purposes. They were formed to invest in U.S. Dollar and foreign denominated debt securities and governmental issuers and to enter into forward currencies contracts, options on currencies and securities and other investments.

In exchange for their investments in Klamath and Kinabalu, Nix and Patterson (through St. Croix and Rogue) each received a 90% interest in their respective partnerships. The other partners in Klamath and Kinabalu were Presidio Resources LLC (which acquired a 9% ownership interest for cash) and Presidio Growth LLC (which acquired a 1% ownership interest for cash). Presidio Growth acted as Managing Partner for each partnership in exchange for a management fee equal to the partners' pro rata share of 1.006% of the fair market value of the partnerships' assets.

In connection with the foreign currency transactions, each of the Partnerships incurred various operating expenses, including ministerial fees, such as state LLC fees and state taxes, related to the formation and operation of the partnerships, management fees, guaranteed payments to Presidio Growth, and loan breakage fees. (Dkt. No. 263, at 9.) These management fees were paid by Nix and Patterson (by charging their capital accounts). In addition to the management fees, the Partnerships made guaranteed payments of $18,000 to Presidio Growth. This was done pursuant to the terms of the LLC agreements, which provided that Presidio Growth, as a Class B Member, was entitled to receive a cash payment equal to 12% of its capital balance. Financially, when Nix and Patterson decided not to continue the investments, the Partnerships paid a breakage fee to NatWest.

The partnership agreements allowed Nix and Patterson to unilaterally withdraw from the investments after each stage. (Tr. I at 59) ("[a]t each particular stage, you had an opportunity to – opt in or out.) Exercising this right, both Nix and Patterson elected to withdraw from the investments after the first stage. Once Nix and Patterson opted out of the investments, Mr. Patterson directed Sid Cohen to wind down the transactions. When Nix and Patterson withdrew from the Partnerships, they received a liquidating distribution of $359,635 and 68,342 Euros (worth $63,726).

**III. Analysis**

*A. Operating Expenses*

As discussed above, the Federal Circuit has remanded for this Court's consideration the limited issue of whether the operating expenses incurred by the partnerships and described above are deductible. To make this determination, the "crucial inquiry" is to determine which party held effective control of each partnership at the time the expenses were incurred. *See Klamath II*, 568

F.3d 551 (5th Cir. 2009) ("The crucial inquiry, then is which partner's intentions should be attributed to the Partnership. Under *Agro Science*, this answer depends on which partner effectively controlled the partnership's activities."). Plaintiffs contend that the "record establishes that Nix and Patterson controlled management of the partnerships at all relevant times." (Dkt. No. 263.) Nix and Patterson support this claim by arguing that Klamath and Kinabalu were formed for the sole and specific purpose of implementing Nix and Patterson's investment decisions and no one else's. Further, this is supported by the fact that both Nix and Patterson took a 90% ownership in their separate partnerships. *Id*. Moreover, Nix and Patterson contend that their effective control over the partnership is also demonstrated by the fact that they alone elected the particular investing strategies (while Presidio used its expertise to specifically implement them). Also, Nix and Patterson retained effective veto power over the investment process through their ability to withdraw as partners. *Id*. Nix and Patterson also argue that they retrained control over the partnership because the partnership agreements specifically stated that Presidio could not act outside the scope of the partnership agreement. *Id.*

The Government responds that Nix and Patterson did not have the right to oversee any of Presidio Growth's management decisions or to use their 90% membership interests to replace Presidio Growth as Managing Member. (Dkt. No. 264.) According to the Government, the only right the other members had to appoint a new Managing Member was if Presidio Growth withdrew from the Partnerships and failed to designate a new Managing Member. *Id*. The Government further contends that Nix and Patterson willingly admitted at trial that Presidio was in charge of the Partnerships' day to day operations. The Government also argues that any contention that Nix and Patterson managed the Partnerships is belied by the fact that the Presidio received a "management fee" of $687,500 for serving as manager. *Id*. In sum, the Government contends

that the Partnerships are not entitled to deduct any of their $903,776 in operational expenses because Presidio managed the Partnerships and Presidio lacked the necessary profit motive to support those deductions for tax purposes.

The Partnerships respond that, although Nix and Patterson delegated day-to-day operational authority to Presidio, the express term of such delegation specifically precluded Presidio from taking "any act in contravention of [the LLC Agreements.]" (Dkt. No. 265, at 4.) In light of this provision, the Partnerships argue that any action taken by Presidio outside of the express delegation of the LLC agreement cannot be attributed to the Partnerships. *See* Del. Code § 18-402 (providing that a delegation of management authority is limited "in the manner provided in a limited liability company agreement"); *Vechery v. Hartford Accident & Indem. Ins. Co.*, 121 A.2d 681, 684 (Del. 1956). It follows, the Partnerships argue, that because the Court expressly found (and the Fifth Circuit affirmed) that Presidio had a secret understanding with NatWest that they would force Patterson and Nix to make an early exit from the partnerships; that Presidio understood that the loan proceeds would not be used to make the contemplated investments "[d]espite provisions in the written documents that might allow the funds to be used to [make those investments]"; and that "Presidio structured the loan transactions to create a tax loss, rather than a profit, for the investors." *Klamath II* 472 F. Supp. 2d 885, 896-97 (E.D. Tex. 2007). With regard to the management fees, the Plaintiffs argue that paying Presidio to manage the day-to-day operations of the Partnerships "merely represented Nix and Patterson's recognition that Presidio was more capable of overseeing the Partnerships' day-to-day operations, not an overall relinquishment of control." (Dkt. No. 265, at 8.) The Partnerships conclude by noting that "[i]nvestors pay professionals to manage their money every day, but that does not mean, as the Government contends, that an investor has given up control of his money." *Id*.

Anatomically speaking, control is the head and management is the hands. The facts fully established in *Klamath I, II and III*, when considered as a whole, leave little doubt that Presidio was the hands while Nix and Patterson were the head. Although the earlier decision of this Court may have wrongly focused on the source of payment as to the operational expenses at issue, the facts developed as to who held effective control of these Partnerships clearly supports the conclusions that Nix and Patterson were in control. They set the parameters within which Presido could operate by means of the partnership agreements. These partnerships were formed and existed for a single purpose – to affect an investment strategy selected by Nix and Patterson. Presidio was the managing partner only because Nix and Patterson made it so. Not only did the partnership agreements **define** Nix and Patterson's investment strategy, they **confined** Presidio to that strategy in express and unequivocal terms; and if all else failed, Nix and Patterson could shut down the whole process by withdrawing from the partnerships they had created. These facts establish Nix and Patterson as the parties having effective control over the partnerships at issue.

The record does not dispute that Presidio had a role to play, but it was managerial only. Its part in this was not the true determining influence, *i.e.*: control. Money management is a global and lucrative business. The management fees reported annually by the likes of Morgan Stanley, Janus Capital Group, Putnam Investments, Blackrock, Fidelity Investments, and countless others are in the billions of dollars. Even these publicly traded managers uniformly tell their customers (in their service agreements and prospectuses) that they simply provide a service for which they are paid. That service is to manage the customer's money according to the plans, guidelines and stated objectives of the customer. Presidio was no different. It's manage fee was not insignificant, but that is not the point. Nix and Patterson were the customer who purchased Presidio's services. However, at all times, the guidelines and stated objectives governing that

relationship were set by Nix and Patterson. Therefore, the Court is persuaded that Nix and Patterson (and not Presidio) had effective control of Klamath and Kinabalu when the operational expenses at issue were incurred. Accordingly, this Court finds and holds that such expenses (as itemized above) should be and are properly deductible by Nix and Patterson.

*B. Pollans & Cohen Fee*

Both parties have raised the issue of how to address the $250,000 fee that Nix and Patterson paid to Pollans & Cohen in exchange for investment advice provided by Sid Cohen.

The parties agree that the $250,000 fees Nix and Patterson paid to Pollans & Cohen for investment advice were an expense that each taxpayer personally incurred as a result of asking Sid Cohen to find and vet potential foreign currency investments. (Dkt. No. 263.) Because "Nix and Patterson at all times pursued the investment strategy with a genuine profit motive," *Klamath*, 568 F.3d at 551, the Plaintiffs contend that the fees that Nix and Patterson paid to Pollans & Cohen for advice and guidance relating to their foreign currency investments are deductible. (Dkt. No. 263, at 17.)

The Government responds that this Court does not have jurisdiction to consider the tax treatment of the payment to Pollans & Cohen because they are not expenses incurred or paid by the Partnerships. The Government relies upon the Tax Equity an Fiscal Responsibility Act of 1982 to support its position:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates; the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f). The Government argues that "Plaintiffs have pointed to no evidence in the record demonstrating that the $250,000 fees paid directly to Pollans & Cohen were incurred or paid by the Partnerships." (Dkt. No. 264, at 23.)

In reply, Plaintiffs argue that the Fifth Circuit "decided by necessary implication" that this Court has jurisdiction to determine the deductibility of the Pollans & Cohen fee. (Dkt. No. 265, at 9) (citing *USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 283 (5th Cir. 2011)). Before the Fifth Circuit, the Government argued that "the district court exceeded its jurisdiction in determining the deductibility of fees paid directly by Patterson and Nix to their accountants for brokering this deal," as part of its argument that the Court exceeded its jurisdiction in ordering a refund. (Dkt. No. 265, at 10.) The Fifth Circuit agreed with the Government that this Court exceeded its jurisdiction in ordering a refund, but the Fifth Circuit did not expressly adopt the Government's arguments that this Court lacked jurisdiction over the Pollans & Cohen fees.

The Court agrees with the Plaintiffs. The Fifth Circuit specifically remanded the issue of operating expenses to this Court for further consideration. Unequivocally, in that Order, the Fifth Circuit stated "[t]hese operational expenses include interest on the loans, a breakage fee, a management fee paid to Presidio, and a $250,000 fee paid to Pollans & Cohen." *Klamath*, 568 F.3d 548-549. By remanding the specific question of the Pollans & Cohen fees (as operating expenses) to this Court for further consideration, the Fifth Circuit acknowledged that this Court has jurisdiction over the $250,000 paid by Nix and Patterson to Pollans & Cohen. The Fifth Circuit certainly would not have expressly directed this Court, through its remand, to take up a matter (the fees paid to Pollans & Cohen) that it had no authority to address. To say otherwise is to say the Fifth Circuit acted in error, which this Court finds is clearly not the case. Further, because the Government does not present any additional arguments beyond the jurisdiction issue –

and because Nix and Patterson (not Presidio) paid the fees – the Court holds that the Pollans & Cohen fee is deductible.

## V. Conclusion

For the foregoing reasons, the Court finds that Nix and Patterson controlled the Partnerships for purposes of determining whether the operating expenses at issue are tax deductible. This Court finds them to be deductible for the reasons expressed above. Accordingly, as this is the sole issue remanded to this Court for further consideration, the parties are each **ORDERED** to submit a proposed final judgment consistent herewith by 5:00 p.m. on Tuesday, September 25, 2012 for the Court's review.

**So ORDERED and SIGNED this 21st day of September, 2012.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE